**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN F. LOPES, by his attorney-in-fact, Amelia P. Lopes | : | CIVIL ACTION NO. |
| | : | 3:10-CV-307 (JCH) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL P. STARKOWSKI, | : | AUGUST 11, 2010 |
| Commissioner, Connecticut | : | |
| Department of Social Services | : | |
| Defendant. | : | |

**RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 30) AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 41)**

**I.     INTRODUCTION**

Plaintiff, John F. Lopes ("Mr. Lopes"), brings this action by and through his attorney-in-fact, Amelia P. Lopes ("Mrs. Lopes") against defendant, Michael P. Starkowski ("Starkowski"), in his official capacity as Commissioner of the Connecticut Department of Social Services ("DSS"), for its denial of Mr. Lopes's Medicaid application, which plaintiff alleges is in violation of various sections of Title XIX of the Social Security Act, 42 U.S.C. § 1396 et. seq. ("Title XIX").  Plaintiff seeks an injunction as well as damages and fees.

Plaintiff moves the court under Fed. R. Civ. P. 56, seeking summary judgment in his favor.  Defendant opposes and has filed a Cross-Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND[1]

Mr. Lopes is eighty-five years old and is a resident at the Riverside Manor Health Care Center, a skilled nursing facility located in East Hartford, Connecticut.  Pl.'s L.R. 56(a)(1) Stmt. at ¶¶ 1-2.  Mr. Lopes has resided there since 2008.  Id. at ¶ 2.  In February 2010, Mrs. Lopes had over $340,000 in assets to her name, whereas Mr. Lopes had less than $1600.  Id. at ¶¶ 8-10.  Under the Medicaid program, as administered by Connecticut, Mrs. Lopes would have had to spend down her assets to under $180,735.00 in order for Mr. Lopes to qualify to receive Medicaid coverage of a portion of his institutional care.  Id. at ¶¶ 8, 11, 14.

Mrs. Lopes decided to purchase an immediate single premium annuity from The Hartford with a premium of $166,220.50.  Id. at ¶ 12.  After this purchase was complete, Mrs. Lopes's remaining savings were approximately $174,780.  Id. at ¶ 14.  Shortly after purchasing the annuity, a Medicaid application was filed, seeking coverage of Mr. Lopes's care at the nursing facility.  Id. at ¶ 15.  In anticipation of a dispute over the assignability of the annuity, Mrs. Lopes requested a letter from The Hartford confirming that she could not cash in, sell, or assign the annuity.  See Def.'s L.R. 56(a)(1) Stmt. at ¶ 7.  The Hartford provided such a letter, in which it confirmed that, "neither the Annuity Contract, nor any periodic payments due thereunder can be cashed-in, sold, assigned, or otherwise transferred, pledged, or hypothecated."  Letter from Sandra Duffy, Manager, Fixed Income Solutions Desk, The Hartford, to Amelia P. Lopes (Mar. 9,

---

[1] For the purposes of this section, undisputed facts will be cited to Plaintiff's Local Rule 56(a)(1) Statement (Doc. No. 32) in support of Plaintiff's Motion for Summary Judgment or Defendant's Local Rule 56(a)(1) Statement (Doc. No. 41) in support of Defendant's Motion for Summary Judgment.

2010), Ex. E to Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 31).

After reviewing Plaintiff's Medicaid application, Dan Butler ("Butler"), Principal Attorney for DSS, attempted to identify a purchaser for the income stream of Mrs. Lopes's annuity. Def.'s L.R. 56(a)(1) Stmt. at ¶ 10. Butler identified a potential buyer, Peachtree Financial Services ("Peachtree"), and, in a letter dated April 16, 2010, directed Mrs. Lopes to attempt to sell the income stream, attaching information from Peachtree. Def.'s L.R. 56(a)(1) Stmt. at ¶ 11; Pl.'s L.R. 56(a)(1) Stmt. at ¶ 20; Letter from Daniel T. Butler, Principal Attorney, Dep't of Soc. Servs., to Amelia Lopes (Apr. 16, 2010) ("Butler's Apr. Letter"), Ex. F to Pl.'s Mem. Peachtree's proposed agreement required Mrs. Lopes to "sell, assign and convey" all of her "rights to and interest in and to the . . . payments due or to become due under the Annuity." Absolute Sale, Assignment and UCC Article 9 Security Agreement (Apr. 9, 2010), Attach. to Butler's Apr. Letter.

In a subsequent letter, dated May 4, 2010, DSS requested Mrs. Lopes supply proof of any attempt to sell the annuity's income stream. Pl.'s L.R. 56(a)(1) Stmt. at ¶ 21. In letters dated May 5, 2010, and May 6, 2010, Mrs. Lopes indicated that she was not legally obligated to sell her annuity's income stream and would not attempt to do so. Id. at ¶¶ 22, 24. On May 18, 2010, DSS denied Mr. Lopes's application on the grounds that Mrs. Lopes failed to cooperate in the pursuit of a potentially available asset. See id. at ¶ 25; Def.'s L.R. 56(a)(1) Stmt. at ¶ 14.

## III.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no

such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

When both parties come before the court on cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for either side. See Ricci v. DeStafano, 530 F.3d 88, 109-10 (2d Cir. 2008). "'Rather the court must

evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Id. (quoting Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

## IV.    DISCUSSION

In 1988, Congress passed the Medicare Catastrophic Coverage Act ("the MCCA"), amending Title XIX to increase the financial protections for individuals with institutionalized spouses. See 42 U.S.C. § 1396r-5. The non-institutionalized spouse (called "the community spouse"), could apply for Medicaid on behalf of her significant other while retaining a certain portion of her own assets. This amount, known as the "community spouse resource allowance" ("CSRA"), is a fixed number adjusted for inflation and, for the purposes of Mr. and Mrs. Lopes, was capped at $180,735.00.[2] See 42 U.S.C. § 1396r-5(f)(2), (g). This meant that, before Mr. Lopes qualified for Medicaid to cover his nursing facility expenses, any assets Mrs. Lopes had above that amount would need to be expended. However, Mrs. Lopes's income could not be taken into account for these calculations. See 42 U.S.C. § 1396r-5(b)(1).

Shortly before applying for Medicaid on Mr. Lopes's behalf, Mrs. Lopes purchased an irrevocable, nontransferable annuity which pays her monthly sums in the amount of $2,340.83. See Pl.'s L.R. 56(a)(1) Stmt. at ¶¶ 12, 15; Annuity Contract Specifications, Ex. B to Pl.'s Mem. This purchase leaves her remaining assets below the applicable cap, providing the monthly payments from the annuity are treated as income. However, defendant asks the court to treat the income stream from this

---

[2] At the time Mr. Lopes's application was filed, the cap was actually $109,560. Pl.'s L.R. 56(a)(1) Stmt. at ¶ 8. However, due to a Connecticut benefits matching program that Mr. Lopes participated in, the cap for Mrs. Lopes was increased by $71,175. Id.

annuity as an available asset.  This treatment would permit DSS to take into account

the value of the asset—according to defendant, the "asset" is the amount the income

stream would sell for on the secondary market—in determining whether Mr. Lopes

qualifies for Medicaid.

A.      Standing

The constitutional standing requirement is rooted in the Cases and Controversies

Clause of Article III and consists of three elements: 1) injury in fact, 2) a causal

connection between the injury and conduct complained of, and 3) a likelihood that the

injury will be redressed by a favorable decision.  See Fulton v. Goord, 591 F.3d 37, 41

(2d Cir. 2009) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  With

respect to the second requirement, plaintiff's injury must be fairly traceable to

defendant's challenged conduct.  Lujan, 504 U.S. at 560; see, e.g., Muntaqim v.

Coombe, 449 F.3d 371 (2d Cir. 2006) (finding no causal connection between a New

York election law and plaintiff's inability to vote).

Plaintiff has clearly stated an injury in fact—defendant's failure to approve

plaintiff's application and plaintiff's resulting costs at the nursing facility—and plaintiff's

injury can be redressed by an injunction and damages.  Defendant argues, however,

that Mr. Lopes's claimed injury is not causally connected to Connecticut Department of

Social Services Uniform Policy Manual ("UPM") section 4030.47, the Connecticut policy

plaintiff is principally challenging.  See Def.'s Mem. at 7-8.  Defendant asserts that the

rejection of Mr. Lopes's application was based on different statutory provisions, and,

therefore, "the requisite nexus between the Department's action . . . and the Plaintiff's

claimed injury . . . does not exist."  Id. at 8.

According to the defendant, plaintiff's application was denied because Mrs. Lopes failed to cooperate with DSS's request to attempt to sell her annuity's income stream. Def.'s L.R. 56(a)(1) Stmt. at ¶ 14; Aff. of Daniel Butler ("Butler Aff.") at ¶ 15, Ex. C to Def.'s L.R. 56(a)(1) Stmt. Defendant cites two specific provisions that require an applicant to "cooperate [with DSS] in pursuing assets." See UPM §§ 3525.15; 8080.35. Plaintiff does not dispute Mrs. Lopes's obligation to cooperate with DSS. Rather, plaintiff claims that Mrs. Lopes did not have any available assets to pursue. According to plaintiff, DSS's treatment of Mrs. Lopes's annuity or its income stream as an "asset" is in violation of the law. DSS defines "the right to receive income from an annuity . . . as an available asset." UPM § 4030.47. It is this definition that plaintiff objects to. Whether DSS relied explicitly on section 4030.47 or implicitly is irrelevant. Plaintiff has standing to challenge the DSS's treatment of Mrs. Lopes's annuity as an "asset" in connection with DSS's conclusion that Mrs. Lopes failed to cooperate in collecting an "asset."

> B.  UPM Section 4030.47

While a state may make a determination for who qualities for Medicaid benefits, Congress has established a floor, requiring that state Medicaid determinations be no more restrictive than the "methodology" used by the Supplemental Security Income Program ("SSI"). See 42 U.S.C. § 1396a(a)(10)(C)(i). Plaintiff argues that section 4030.47 violates this requirement, by defining "assets" too broadly. Defendant disagrees and also argues, in the alternative, that its regulations are now permitted as a result of amendments to Title XIX by the Deficit Reduction Act of 2005 ("the DRA"). The court will analyze both of these arguments in turn.

1.      Section 4030.47 Is More Restrictive Than SSI

Title XIX makes it quite clear that state Medicaid requirements cannot be <u>more</u>

onerous than criteria used by SSI.  <u>See</u> 42 U.S.C. § 1396a(a)(10)(C)(i), (r)(2)(B).  In this

case, the question the court must answer is whether Connecticut's definition of "asset"

to include an annuity's income stream is broader than would be applied to a similarly

situated individual under SSI's criteria, and thus would result in a more stringent

qualifying standard.  However, defendant argues that its treatment of annuity income

streams is no broader than the treatment would be using SSI methodology.  <u>See</u> Def.'s

Opp. at 19-20; Def.'s Reply at 4 (Doc. No. 45).  Defendant fails to point to a single case

supporting his position, and this court was unable to locate any.  The Third Circuit

seems to be the only court to have addressed this issue in any detail.  <u>See</u> <u>James v.</u>

<u>Richman</u>, 547 F.3d 214 (3rd Cir. 2008); <u>see also</u> <u>J.P. v. Mo. State Family Support Div.</u>,

No. WD 70994, 2010 WL 1539870, at *4 (Mo. Ct. App. Apr. 20, 2010) (relying on

<u>James</u>).  It held that, under SSI, an unassignable annuity's income stream would be

treated as income and not as an asset.  <u>See</u> <u>James</u>, 547 F.3d at 218-19.  The court

finds the Third Circuit's analysis in <u>James</u> persuasive and, for the following reasons,

reaches the same conclusion.

SSI regulations provide that, "if an individual has the right, authority or power to

liquidate the property, or his or her share of the property, it is considered a resource."

20 C.F.R. § 416.1201(a)(1).  The SSI Program Operation Manual System (POMS)

clarifies that these must be "legal right[s]."[3]  POMS § SI 0110.115.  Therefore, while

---

[3] The court grants substantial deference to the interpretations found in these guidelines "as long as they are reasonable and consistent with the statute."  <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181 (2d Cir. 1998).

Mrs. Lopes may be capable of assigning her right to receive payments under the annuity, if such an assignment would require her to breach her legal obligation to The Hartford, the ability to make such an assignment is not a sufficient basis to characterize the income stream of her annuity as an asset (or "resource") under SSI.

Plaintiff has submitted a letter from The Hartford to Mrs. Lopes, which letter states that no aspect of Mrs. Lopes's annuity is assignable, including "any periodic payments due thereunder." Letter from Sandra Duffy, Manager, Fixed Income Solutions Desk, The Hartford, to Amelia P. Lopes (Mar. 9, 2010), Ex. E to Pl.'s Mem. While defendant disagrees with plaintiff's characterization of the annuity's income stream as unassignable, see Def.'s L.R. 56(a)(2) Stmt. at ¶ 19, defendant has not produced any evidence to support its denial. Rather, defendant points to communications between Butler and Peachtree regarding Peachtree's willingness to purchase the annuity. See id.; Butler Aff. at ¶¶ 5-8. However, Butler states that Peachtree "could purchase the annuity's income stream if The Hartford agreed to accept a change in payee designation." Butler Aff. at ¶ 7 (emphases added). The uncontested letter from The Hartford makes clear that no such change would be accepted (or even permitted) under the terms of the annuity.

Additional sections of Title XIX support the treatment of the income stream produced by an unassignable annuity as income and not as a resource. See James, 547 F.3d at 219. Title XIX specifically excepts annuities from the list of purchases and transfers that result in a penalty to a Medicaid applicant, providing they are designed

according to a list of criteria.[4]  See 42 U.S.C. § 1396p(c)(1)(F)-(G).  Mrs. Lopes followed

all of these criteria when purchasing her annuity, including the naming of the State of

Connecticut as the primary beneficiary of the remainder of her annuity up to the amount

of its care for her husband.  See Application for Single Premium Payout Annuity by

Amelia P. Lopes, Ex. C to Pl.'s Mem.  With these principles in mind, the court finds that

UPM section 4030.47 violates federal law, as applied to Mr. and Mrs. Lopes, by treating

Mrs. Lopes's income stream as an asset, a characterization which is more restrictive

(admits less applicants) than would be applied to a similarly situated individual under

the methodology utilized by SSI.

Even if Mrs. Lopes's income stream were assignable, the Third Circuit's analysis

in James compels the same result.  See James, 547 F.3d at 218-19.  It would be

incongruent with the principles of the MCCA to permit a state to characterize even an

assignable income stream as an asset.  See 42 U.S.C. § 1396r-5(b)(1) ("[N]o income of

the community spouse shall be deemed available to the institutionalized spouse.").

Defendant's proposed interpretation would open the door to states recharacterizing

other income sources as assets, such as "payments tied to a fixed income retirement

account, social security, or even a regular paycheck."  James, 547 F.3d at 219.  Such

an interpretation would also not be consistent with the permissive view of carefully

structured, unassignable annuities expressed by Congress in the asset purchase and

---

[4] If a Medicaid applicant disposes of an asset for less than fair market value, she will receive a
penalty on her benefits relative to the value of the assets she disposed of.  See 42 U.S.C. § 1396p(c).
The purchase of an annuity will automatically be treated as the disposal of an asset for less than fair
market value unless the purchaser names the State as primary beneficiary of the remainder (or in some
cases the secondary beneficiary).  See 42 U.S.C. § 1396p(c)(1)(F).  Additionally, in the context of a
Medicaid applicant applying for nursing facility care, an annuity purchase will be treated as a transfer of
assets, unless the annuity is (1) irrevocable and nonassignable, (2) actuarially sound, and (3) provides for
payments in equal amounts during the term of the annuity.  See 42 U.S.C. § 1396p(c)(1)(G).

transfer provisions of Title XIX.  See 42 U.S.C. § 1396p(c)(1)(F)-(G); see also James,

547 F.3d at 219.

> 2. The Deficit Reduction Act of 2005

Defendant argues further that an amendment to Title XIX contained in the DRA

alters the analysis and that annuities are now permitted to be regarded as assets.  This

law is largely unexamined.  However, the majority of courts to analyze this issue (and

the only federal courts to have done so) have found that an unassignable annuity is not

subject to treatment as an asset, even after passage of the DRA.  See Weatherbee v.

Richman, 351 F. App'x 786 (2d Cir. 2009); J.P. v. Mo. State Family Support Div., No.

WD 70994, 2010 WL 1539870 (Mo. Ct. App. Apr. 20, 2010) ; Vieth v. Ohio Dep't of Job

& Family Servs., No. 08AP-635, 2009 WL 2331870 (Ohio Ct. App. July 20, 2009); see

also Weatherbee v. Richman (Weatherbee I), 595 F. Supp. 2d 607 (W.D. Pa. 2009),

aff'd, 351 F. App'x 786; but see N.M. v. Div. of Med. Assistance & Health Servs., 405

N.J. Super. 353 (App. Div. 2009).

As amended by the DRA, section 1396p(e) of title 42 of the United States Code

now reads:

> (1) In order to meet the requirements of this section for purposes of section
> 1396a(a)(18) of this title, a State shall require, as a condition for the provision
> of medical assistance for services described in subsection (c)(1)(C)(i) of this
> section (relating to long-term care services) for an individual, the application
> of the individual for such assistance (including any recertification of eligibility
> for such assistance) shall disclose a description of any interest the individual
> or community spouse has in an annuity (or similar financial instrument, as
> may be specified by the Secretary), regardless of whether the annuity is
> irrevocable or is treated as an asset.  Such application or recertification form
> shall include a statement that under paragraph (2) the State becomes a
> remainder beneficiary under such an annuity or similar financial instrument
> by virtue of the provision of such medical assistance.

(2)(A) In the case of disclosure concerning an annuity under subsection (c)(1)(F) of this section, the State shall notify the issuer of the annuity of the right of the State under such subsection as a preferred remainder beneficiary in the annuity for medical assistance furnished to the individual.  Nothing in this paragraph shall be construed as preventing such an issuer from notifying persons with any other remainder interest of the State's remainder interest under such subsection.

(B) In the case of such an issuer receiving notice under subparagraph (A), the State may require the issuer to notify the State when there is a change in the amount of income or principal being withdrawn from the amount that was being withdrawn at the time of the most recent disclosure described in paragraph (1).  A State shall take such information into account in determining the amount of the State's obligations for medical assistance or in the individual's eligibility for such assistance.

(3) The Secretary may provide guidance to States on categories of transactions that may be treated as a transfer of asset for less than fair market value.

(4) Nothing in this subsection shall be construed as preventing a State from denying eligibility for medical assistance for an individual based on the income or resources derived from an annuity described in paragraph (1).

42 U.S.C. § 1396p(e).  Defendant argues that subsection (4) now provides that states are permitted to treat annuities as assets for the purpose of state Medicaid programs.  However, defendant's reading of this section strains the plain meaning of the statutory language.  First, the sentence is self-limiting.  See Weatherbee I, 595 F. Supp. 2d at 616.  Rather than applying to the entire title, it purports to address only the "subsection" of which it is a part.  Subsection (e) primarily establishes a new requirement that Medicaid applicants disclose to the state any interest in an annuity held by an applicant or her spouse.  Reading subpart (4) in this context, the meaning is clear: merely following the disclosure requirements of this subsection does not suffice to prevent the state from making a determination of the annuity's effect on the applicant's eligibility.  If, for example, the annuity in question was assignable, then a state could find it to be an

12

asset and thus have a basis for denying eligibility.  See id. at 616-17.

Defendant's reading would also be incongruous with the retention of the subsections discussed, supra at 10 n.4, indicating Congress's generally permissive attitude toward carefully constructed annuities.  See 42 U.S.C. § 1396p(c)(1)(F)-(G).  "If Congress had intended to 'ring the death knell' for otherwise compliant annuities, it would have said so.  It did not."  Weatherbee I, 595 F. Supp. 2d at 617.

Defendant points to several statements released by the Centers for Medicare and Medicaid Services ("CMS") to further support his assertion that the DRA has changed the permissible treatment of annuities.  A statement released on July 27, 2006, provides: "The State may take into consideration the income or resources derived from an annuity when determining eligibility . . . .  [E]ven though an annuity is not penalized as a transfer . . . it must still be considered in determining eligibility, including spousal income and resources, and in the post-eligibility calculation, as appropriate."  Ctrs. for Medicare & Medicaid Servs., Changes in Medicaid Annuity Rules Under the Deficit Reduction Act of 2005 (July 27, 2006).  As with the new statutory provision, this statement does not clarify how any given annuity is to be analyzed, only that it can be considered as either "income" or "resources."[5]  Two additional CMS statements, released on July 23, 2007, and August 6, 2007, defined an "assignable" annuity as an annuity whose "owner or payee may be changed," and stated that such "assignable" annuities would be treated as "countable resources" valued according to the amount they could be sold on the secondary market.  Ctrs. for Medicare & Medicare Servs.,

_____

[5] "Resources" is another word for "assets" in this context.

13

Mem. from Dir. of Disabled & Elderly Health Programs Grp. (July 23, 2007) ("CMS July

2007 Mem."); Ctrs. for Medicare & Medicare Servs., State Agency Reg'l Bulletin, No.

2007-09 (Aug. 6, 2007) ("CMS Aug. 2007 Bulletin"). These statements, however, are

not helpful in analyzing Mrs. Lopes's annuity. Plaintiff has established that all aspects

of Mrs. Lopes's annuity are unassignable, including her right to receive payments on it.

Therefore, these statements do not apply to Mrs. Lopes's annuity.

If the income stream of Mrs. Lopes's annuity were found to be assignable, the

court notes that the statements by CMS may very well suggest a different outcome.

The 2007 statements claim that, if "payee may be changed," then an annuity is

"assignable" and can be treated as a "countable resource." CMS July 2007 Mem.; CMS

Aug. 2007 Bulletin. However, while the court is obligated to grant deference to the

interpretations by the CMS, see Wong v. Doar, 571 F.3d 247, 258-60 (2d Cir. 2009)

(granting Skidmore deference to CMS manual), it must not do so if the interpretation is

not supported by the statute, see id. at 260 ("'[N]o deference is due to agency

interpretations at odds with the plain language of the statute itself . . . .'" (quoting John

Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 109 (1993)). The

court has already discussed, supra, that the DRA amendments, particularly with respect

to section 1396p(e)(4), do not support the finding of a complete alteration to Title XIX's

treatment of annuities as income or assets. Therefore, the court finds the CMS

statements unpersuasive in that regard.

V.    CONCLUSION

For the foregoing reasons, the court grants Plaintiff's Motion for Summary

Judgment (Doc. No. 30) and denies Defendant's Cross-Motion for Summary Judgment

14

(Doc. No. 41).  DSS is directed to approve plaintiff's Medicaid application and, pursuant

to its agreement on the record on May 19, 2010, is ordered to retroactively pay

damages to plaintiff in the amount of money he would have been due had DSS

approved plaintiff's application in February 2010.  Plaintiff is instructed to file a motion

for reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988, together with

supporting documents, by August 27, 2010.  If defendant objects, he must file his

objection no later than September 13, 2010.  The Clerk is directed to close the case.

**SO ORDERED.**

        Dated at Bridgeport, Connecticut this 11th day of August, 2010.


                /s/ Janet C. Hall
                Janet C. Hall
                United States District Judge